IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
EASTERN DIVISION
Case No. 4:20-cv-00095-M

EDWARD LEE ANDERSON, as
Administrator of the Estate of CORY
ANDERSON,

        Plaintiff,

v.

SOUTHERN HEALTH PARTNERS, INC.;
COUNTY OF BEAUFORT, NORTH
CAROLINA;
ERNIE COLEMAN, in his official capacity as
Sheriff of Beaufort County, N.C.; and
THE OHIO CASUALTY INSURANCE
COMPANY,

        Defendants.

**ORDER**

These matters come before the court on the Motion for Summary Judgment filed by Defendants Beaufort County, Sheriff Ernie Coleman ("Coleman"), and Ohio Casualty Insurance Company ("Ohio Casualty") (collectively, "Beaufort Defendants") [DE 38] and the Motion for Summary Judgment filed by Defendant Southern Health Partners, Inc. ("SHP") [DE 42]. Although provided the opportunity to do so, Plaintiff did not file responses to these motions within the time required by local rule and, at status conference before this court, Plaintiff's counsel confirmed that he did not intend to do so. For the reasons that follow, the motions are granted.

I.    **Background**

    A.    <u>Procedural Background</u>

On May 7, 2020, Plaintiff filed the operative Complaint in Beaufort County Superior Court alleging several claims in connection with the death of Cory Edward Anderson ("Anderson") on

May 8, 2017. The action was removed to this court on June 3, 2020, pursuant to 28 U.S.C. § 1331 governing federal question jurisdiction. *See* Notice, DE-1. SHP responded by filing an Answer, then filed a motion for partial dismissal of Plaintiff's claims. DE 10, 27. Likewise, the Beaufort Defendants responded to the Complaint by filing an Answer and an Amended Answer, then they also filed a motion for partial dismissal of the Complaint. DE 6, 31, 35. The court granted SHP's motion and granted in part the Beaufort Defendants' motion (DE 33, 37); thus, the claims remaining in this case are: Plaintiff's third cause of action for violation of § 162-55 of the North Carolina General Statutes against Defendants Coleman and Ohio Casualty; fifth cause of action for deliberate indifference to the Plaintiff's safety by policy, practice, or custom in violation of the Eighth Amendment[1] against the Beaufort Defendants; sixth cause of action for deliberate indifference to the Plaintiff's health by policy, practice, or custom in violation of the Eighth Amendment against all Defendants; and seventh cause of action for deliberate indifference to the Plaintiff's health by the conduct of prison and healthcare officials in violation of the Eighth Amendment against Defendants Coleman and Ohio Casualty.

Defendants filed the present motions, contending that no genuine issues of material fact exist demonstrating they violated the Anderson's constitutional or statutory rights. Plaintiff filed no response(s) to the present motions before the deadline set forth in Local Civil Rule 7.1(f); accordingly, on January 10, 2022, the court held a status conference at which Plaintiff's counsel confirmed that he filed no responses to the Defendants' motions and did not intend to do so.

---

[1] As found previously in this case, although the Plaintiff references both "inmates and pretrial detainees held at the Beaufort County Detention Center," and pretrial detainees' rights against deliberate indifference are governed by the Fourteenth Amendment's due process clause (*see Hall v. Holsmith*, 340 F. App'x 944, 946 (4th Cir. 2009) (citing *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988))), Plaintiff alleges the Decedent was serving a "sentence" at the facility and, thus, as a "convicted prisoner," his claim is governed by the Eighth Amendment.

2

B.    Findings of Fact

Unless they cite to the record, the following findings of relevant facts are undisputed for purposes of the present motion. The court will not consider proffered "facts" supported solely by the operative pleading in this case. *See Atkins v. Glaser T*, 823 F. App'x 218, 219 (4th Cir. 2020) ("... 'the nonmoving party [must] go beyond the pleadings' and rely on 'affidavits, ... depositions, answers to interrogatories, and admissions on file' to prove that a genuine issue of material fact exists.") (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986)); *Butler v. Drive Auto. Indus. of Am., Inc.*, 793 F.3d 404, 408 (4th Cir. 2015) (citation and internal quotation marks omitted) ("To overcome a motion for summary judgment, however, the nonmoving party may not rely merely on allegations or denials in its own pleading but must set out specific facts showing a genuine issue for trial.").

1.    Cory Anderson, the decedent, was an inmate at the Beaufort County Detention Center from April 28, 2017 to May 7, 2017, during which time he was serving a thirty-day sentence on a conviction of driving while impaired.

2.    SHP is a private, corporate provider of health care services that mainly contracts with local city or county jails to provide general health care services at those jails. SHP employs and places a permanent medical staff of registered nurses and licensed practical nurses at each jail, and contracts with local physicians and/or physician extenders, such as nurse practitioners and physician assistants, to serve as medical directors and to provide health care services at each jail. The health care services provided at each jail in North Carolina are rendered under the supervision and direction of physicians and/or physician extenders licensed under Chapter 90, Article 1 of the North Carolina General Statutes.

3.      At all times relevant to the events at issue in this lawsuit, SHP was contracted to provide health care services to inmates incarcerated at the Beaufort County Detention Center ("Detention Center" or "Jail"). During the relevant period, SHP employed a registered nurse, who held the role of the Medical Team Administrator ("MTA"), and several licensed practical nurses to provide on-site medical services to inmates twelve hours per day, seven days per week. The MTA was on-call twenty-four hours per day, seven days per week.

4.      In addition, a physician assistant was independently contracted by SHP to serve as the Medical Director for the Jail. The physician assistant was not onsite every day but was available to the nursing staff by telephone for any questions regarding treatment of inmates. Further, a regional representative for SHP located in North Carolina, who would have been a licensed registered nurse, was also available to nursing staff at the Jail. The regional representative would not have been present every day but was available to the nursing staff by telephone for any questions, concerns, or updates regarding inmates.

5.      SHP has developed policies, procedures, and treatment protocols for its employees and agents to consult in carrying out their duties in detention center medical departments. SHP regularly revises and updates these policies, procedures, and treatment protocols, in an effort to provide consistent, efficient, and thorough healthcare services.

6.      At all relevant times, SHP maintained standard policies, procedures, and treatment protocols for all of its medical providers, including for the medical providers at the Jail.

     a.      It was standard policy at the Jail for a newly booked inmate to have a medical history and physical exam performed by medical staff within fourteen days of booking.

4

b.     It was standard policy at the Jail for newly booked inmates with reported known chronic or serious medical conditions, such as high blood pressure, to have a medical history and physical exam performed by medical staff within twenty-four hours of booking.

c.     It was standard policy at the Jail for any inmate placed on a drug or alcohol withdrawal treatment plan to be seen and have his vitals checked by medical staff at least once per day.

d.     Newly hired nursing staff for the Jail would be given on-site training during their first few weeks at the Jail. This initial training was administered and overseen by the MTA at the Jail.

e.     The nursing staff at the Jail were assigned online training courses by SHP. Such online training courses were assigned and/or completed continuously throughout the year and were completed by nursing staff on their own time.

f.     Routine quality improvement reviews were conducted at the Jail by either the MTA or by a North Carolina regional representative of SHP, to ensure that the care and treatment of inmates complied with the policies set forth by SHP. Each of these reviews focused on a different type of care or treatment, as well as the implementation of the policies related to the respective type of care or treatment. These reviews were routine reviews.

7.     At all relevant times, Joy Cherry-Pike, RN, was the MTA at the Jail. She became permanently licensed as a registered nurse in 1993 and has maintained an active license as a registered nurse since that time.

8.     As the MTA, Cherry-Pike received specific initial training regarding her role, specifically with regard to coordinating the medical personnel at the Jail and the treatment of inmates.

5

9.       The medical director for the Jail was Physician Assistant Jerry Leggett, who was available for consultation by telephone at any time, and who came to the Jail to review patient charts and to evaluate patients approximately one day a week.

10.       Nurses at the Jail were provided various types of training by SHP and its representatives and employees. Newly hired nurses completed orientation training, administered by the MTA, during the first few weeks after they began working at the Jail. In addition, all nurses at the Jail were assigned continuous, treatment-specific online training programs by SHP.


11.       Inmates at the Detention Center were able to request medical care or ask to be seen by medical staff by submitting a Sick Call slip. If an inmate did not submit a Sick Call slip, then there was no guarantee that medical personnel would know to see that inmate for treatment.

12.       Inmates at the Detention Center were brought to the medical station to receive treatment by the nursing staff. Except for emergency situations or distribution of medications, nurses generally would not see inmates for treatment outside of the medical station.

13.       If an inmate was placed on a treatment regimen that required daily checks, such as a blood pressure check program or a withdrawal treatment plan, then that inmate would generally be brought to the medical department to be seen and have his vitals checked at least once per day.

14.       Lieutenant Kathryn Bryan was the Jail Administrator of the Detention Center at the time of Anderson's incarceration in May 2017. She was responsible for applying the rules and laws that govern the operation of the detention center. She assigned subordinates and directed them to ensure that all policies, rules, regulations, orders, procedures, and directives were implemented and enforced properly.

15.     Bryan attests that "[t]he policy of the Beaufort County Detention Center is to ensure a safe and secure environment for the sheriff's office personnel, the civilian staff, and the inmates."

16.     To serve as a duly appointed Detention Officer, the North Carolina Department of Justice requires individuals to complete the North Carolina Detention Officer Certification (DOC) course. Completion of this course allows a person to serve as a Detention Officer in this state. The course consists of at least 172 hours of academic and physical training, covering numerous topics of instruction, which include, but are not limited to: legal aspects of management and supervision; detention center rules and regulations; patrol and security functions of the jail; supervision and management of inmates; suicides and crisis management; first aid and CPR; and medical care in the jail.  The training and practical instruction specifically cover the responsibilities required of Detention Officers with regard to monitoring the health and safety of inmates as well as inmate access to medical care.

17.     Bryan attests that "[t]o [her] knowledge, all policies and procedures [regarding medical treatment for inmates] were followed with respect to Mr. Anderson. . . . [She] did not observe, nor was [she] aware of, any events or circumstances that caused [her] to think that Mr. Anderson did not receive adequate medical care while detained at the Beaufort County Detention Center."

18.     On Friday, April 28, 2017, at approximately 9:30 a.m., Anderson was booked at the Jail by a detention officer. At that time, the officer completed an intake screening form on which the officer noted that Anderson had been treated for high blood pressure and generalized anxiety. The intake screening form did not list any of Anderson's current medications, nor did it list any current symptoms of illness.

19.     During his time at the Detention Center, Anderson was housed in A-block, which consists of open quarters and a connected day room. There are no individual cells in A-block, and inmates are able to move freely from their sleeping quarters to the day room.

20.     On Saturday, April 29, 2017, at approximately 8:40 a.m., a nurse reviewed Anderson's intake screening form. Anderson was later brought to the nurses' station for his medical intake screening, and the same nurse completed a medical staff receiving screening form for him. Anderson again reported that he had high blood pressure and anxiety. He also reported that he had been hospitalized by a physician or psychiatrist within the previous year for chest pain, and for alcohol abuse with anxiety issues. Anderson stated that he had been taking the medications Lisinopril and Klonopin, although had could not recall the dose or quantity of those medications at the time.

21.     At the screening, Anderson denied having any current medical issues except anxiety, and his vital signs were recorded and appeared within normal limits, with the exception of a high blood pressure reading.

22.     Anderson signed a "Consent for Treatment" form, as well as an "Authorization for Release of Medical Information to Correctional Facility" form for Vidant Beaufort Hospital and/or Vidant Behavioral Health, so that the Jail could obtain Anderson's medical records and medication history from that facility. The nurse faxed the completed "Authorization" form to the facility the same day; however, copies of Anderson's prior medical records were not sent until sometime on or after May 1, 2017.

23.     That same day, April 29, 2017, the nurse entered P.A. Leggett's order to begin Anderson on daily blood pressure checks for five days.

8

a. On April 29, 2017, Anderson's blood pressure reading was 140/90 in his left arm and 130/88 in his right arm.

b. On April 30, 2017, Anderson's blood pressure reading was 150/90 in his right arm and 140/90 in his left arm.

c. There was no blood pressure check recorded for Anderson on May 1, 2017.

24. On May 2, 2017, Cherry-Pike was the nurse who saw Anderson and recorded his blood pressure as 132/86. Anderson reported to her that he had been on a prescription of Klonopin 0.5mg, four times daily for months. He stated that he had terrible anxiety and was seeing Dr. Swaminathan at Vidant Behavioral Health.

25. Cherry-Pike reviewed Anderson's chart and sent a Request for Information to Vidant Behavioral Health. She received Anderson's records the same day and confirmed that he was taking Klonopin, as he reported. In addition, the sheriff's office learned that Anderson had been in the hospital two weeks prior to his admission to the Detention Center for "severely elevated blood pressure."

26. Cherry-Pike saw Anderson again on May 2, 2017, and instructed him about withdrawing from benzodiazepines such as Klonopin and the increased risk of seizures. Anderson informed Cherry-Pike that he had discussed this situation with his Probation Officer and had asked for a change in his sentence ("split days") because he had been on Klonopin for a while and wanted to continue taking it. (Sergeant Davis at the Jail later agreed to let Anderson make a phone call to his Probation Officer to discuss this type of intervention.) In addition, Anderson informed Cherry-Pike that he also had been taking Lisinopril but did not want to continue taking it. Cherry-Pike instructed Anderson to let medical staff know what his Probation Officer said, so that staff could begin the detoxification procedure; Anderson responded that he understood.

27.     At no time on May 2, 2017, did Anderson express to Cherry-Pike that he had any medical issue other than anxiety, and he did not appear to have any symptoms of any other illness.

28.     On the morning of May 3, 2017, when Cherry-Pike was passing medication to the inmates in the "A" block, Anderson informed her that he did not contact his Probation Officer, so he left the officer a voicemail message.

29.     Later that morning, Cherry-Pike spoke with Sergeant Davis, and he again allowed Anderson to call his Probation Officer. (Ex. 1 at 8). Anderson later informed Cherry-Pike that his Probation Officer was "not going to let him change his sentence." As a result, Cherry-Pike discussed with Anderson the benzodiazepine detoxification protocol and the importance of safely coming off of benzodiazepines. Anderson agreed to the plan of care.

30.     After this second meeting with Anderson on May 3, 2017, per an order from P.A. Leggett, Cherry-Pike ordered a three-day supply of Librium, Thiamin for ten days, a multivitamin for fourteen days, and Dilantin for thirty days. She received the prescription medications that same day, and started distributing the Librium and Dilantin to Anderson in the evening of May 3, 2017 and the Thiamin and a multivitamin in the morning of May 4, 2017.

31.     Cherry-Pike also checked Anderson's blood pressure in the afternoon of May 3, 2017 and recorded it as 140/82 on his blood pressure record form, as well as on a new Flow Chart for alcohol and drug withdrawal. Anderson also reported having slight nausea, anxiety, sweating, shakiness, and weakness, which were each recorded separately on Anderson's withdrawal Flow Chart. Anderson did not have an elevated temperature and did not report feeling any symptoms other than those for withdrawal.

32.     On May 4, 2017, Anderson received his prescribed medications, and a nurse recorded his blood pressure (140/80) and other vitals, as well as withdrawal symptoms, on his withdrawal Flow

Chart. Anderson reported having slight nausea, anxiety, sweating, shakiness, and weakness, which were each recorded separately on Anderson's withdrawal Flow Chart. He did not have an elevated temperature and did not report feeling any symptoms other than those for withdrawal.

33.     On May 5, 2017, Anderson received his prescribed medications, and a nurse recorded his blood pressure (120/80) and other vitals, as well as withdrawal symptoms, on his withdrawal Flow Chart. Anderson did not have an elevated temperature and did not report feeling any symptoms other than anxiety and slight sweating.

34.     On May 6, 2017, Anderson received his prescribed medications, and a nurse recorded his blood pressure (110/70) and other vitals, as well as withdrawal symptoms, on his withdrawal Flow Chart. Anderson did not have an elevated temperature and did not report feeling any symptoms other than anxiety and weakness.

35.     On May 7, 2017, at approximately 1:30 p.m., Cherry-Pike saw Anderson in the nursing station for his withdrawal check. At this time, Anderson stated that he felt the worst he ever felt, and that he believed he may have "caught something." Anderson stated that he vomited during the night, which was unrelated to the detoxification, and that he was unable to sleep. When Anderson admitted that he did not alert the detention officers he had vomited at any time during the night, Cherry-Pike instructed Anderson again on the importance of reporting any abnormalities to the detention officers or to medical staff.

36.     Cherry-Pike recorded that Anderson's appearance was grayish and pasty, his blood pressure was 138/100, his pulse was 158 to 162 beats per minute, his temperature was 100.5 degrees Fahrenheit, and he was having chest pain at that time. Cherry-Pike administered to Anderson 0.4mg of nitroglycerin and a dose of aspirin. She also called Supervisor McCray and

instructed her to call 911 for emergency transportation of Anderson to the Beaufort Hospital emergency room for evaluation and treatment.

37.     Cherry-Pike rechecked Anderson's blood pressure and found it had decreased to 112/80 but his pulse remained at 150-160 beats per minute. Anderson had become anxious, and Cherry-Pike assured him that emergency medical services were on the way to transport him to the hospital. Anderson remained at all times in the nurses' station from 1:30 p.m. until emergency medical services arrived.

38.     Cherry-Pike reported Anderson's condition to emergency medical services staff when they arrived.  Anderson was able to walk to the stretcher with assistance, and he was transported by stretcher to the emergency vehicle.  At that time, Cherry-Pike asked emergency medical services to perform a rhythm strip, which was completed at 1:56 p.m.; Anderson's pulse was recorded as 138 beats per minute. Immediately after Cherry-Pike received the rhythm strip, Anderson was transported to the Beaufort Hospital emergency room.

39.     Once Anderson was taken to Beaufort Hospital, none of the medical staff at the Jail provided Anderson any further treatment or medical care.

40.     At no time prior to May 7, 2017, did Anderson inform medical staff at the Jail that he had any symptoms of a cold, of pneumonia, or of any other similar illness.  In addition, at no time prior to May 7, 2017, did Mr. Anderson inform medical staff at the Jail that he was having chest pain during his detention.

41.     During his incarceration, Anderson moved in and out of his day room and sleeping quarters without any problem.  He was on twice-an-hour observations because he had no medical or disciplinary issues that would necessitate more frequent observations.  Anderson made no complaints or reports about, and showed no signs of, illness before May 7, 2017.

42.     The Detention Center officers conducted, with one possible exception on May 6, 2017, at approximately 5:53 a.m., all required rounds of observation on Anderson twice every hour. The one round of observation that was possibly missed did not adversely affect Anderson's health or safety. The next round was conducted at 6:20 a.m. and the officers observed no issues with Anderson or any other inmates.

43.     Deputy Sheriff Timothy Tetterton, who is now an emergency medical technician-paramedic, rode with Anderson to the hospital. According to Tetterton, Anderson "was talking and did not appear to be in a life-threatening condition."

44.     Tetterton stayed with Anderson at the hospital, both in the emergency department and the intensive care unit, for about three hours, left for about two hours during which time he was replaced by another deputy, then returned to sit with Anderson for about another two hours. During this time, Tetterton spoke with Anderson, who "opened his eyes, talked, rolled around in his bed, and asked [Tetterton] to change the channel on the television for him."

45.     Both in the ambulance and later in the hospital, Anderson told Tetterton "that he had been sick in jail but never said anything to anyone about it."

46.     At the hospital, Anderson reported to medical staff that "something has been going around the jail" and he "may have pulled a muscle vomiting." DE 46 at 46-47. He reported the following symptoms that "began a little over a week ago": "sinus pressure, dizziness, sore throat, then increased coughing and now will vomit after coughing and has felt 'hot and sweaty for days.'" *Id.* at 47. Anderson also reported that he smoked a pack of cigarettes a day for fifteen years. *Id.* The record does not contain any report by Anderson of the medical treatment (or any lack thereof) he received at the Jail.

13

47.     Anderson was diagnosed in the emergency department with sepsis, double pneumonia, and "lactic acid increased." *Id.* at 52. He was admitted to the intensive care unit for monitoring and treatment. *Id.* at 55.

48.     Anderson reported to the physician in ICU that he "felt well when he got in" to the Detention Center eight days previously but then "caught the cough that the rest of the inmates were passing around." *Id.* He stated that "he developed fever, chills, night sweats and a dry cough. He got worse for a few days and then better for a day and then worse again for a few days until he was brought to the [hospital]." *Id.* Anderson also told the physician that he "has a history of alcohol abuse" and he "was given Librium for alcohol withdrawal precautions, but he was not able to keep them down for the past few days due to his nausea and vomiting." *Id.* at 56.

49.     At approximately 3:30 p.m. the following day, May 8, 2017, a nurse in the intensive care unit at Beaufort Hospital informed Cherry-Pike that Anderson was not doing well, had "coded" four times since arriving, and had been placed on a ventilator.

50.     Anderson passed away on May 8, 2017. Deputy Tetterton was "surprised" that Anderson died, because, to Tetterton, "he did not appear to be that sick."

51.     After Anderson's death, Tetterton wrote a brief statement to note what Anderson had told him:

> Anderson stated he came in to the Beaufort County Detention Center feeling sick. Anderson stated he never made Detention Center Staff aware of his sickness upon entry into our facility. Anderson stated he didn't make staff aware until his sickness became unbearable.

## II.     Legal Standards

Rule 56 of the Federal Rules of Civil Procedure governs motions for summary judgment. If "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law" the court shall grant summary judgment. Fed. R. Civ. P.

14

56(a). A dispute is "genuine" if the evidence would permit a reasonable jury to find for the nonmoving party, and "[a] fact is material if it might affect the outcome" of the litigation. *Jacobs v. N.C. Admin. Office of the Courts*, 780 F.3d 562, 568 (4th Cir. 2015) (internal quotations and citations omitted). The court's role at the summary-judgment stage is not "to weigh the evidence and determine the truth of the matter" but instead "to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). Accordingly, the court must "resolve all factual disputes and any competing, rational inferences in the light most favorable" to the nonmoving party. *Rossignol v. Voorhaar*, 316 F.3d 516, 523 (4th Cir. 2003) (quoting *Wightman v. Springfield Terminal Ry. Co.*, 100 F.3d 228, 230 (1st Cir. 1996)).

When the nonmovant bears the burden of proof at trial, the party seeking summary judgment bears the initial burden of "pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party carries this initial burden, the burden then shifts to the nonmoving party to point out "specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis in original). In so doing, "the nonmoving party must rely on more than conclusory allegations, mere speculation, the building of one inference upon another, or the mere existence of a scintilla of evidence." *Dash v. Mayweather*, 731 F.3d 303, 311 (4th Cir. 2013). Instead, the nonmoving party must support its assertions by "citing to particular parts of . . . the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1); *see Celotex*, 477 U.S. at 324. While "it is the province of the jury to resolve conflicting inferences from circumstantial evidence[,] [p]ermissible inferences must still be within the range of reasonable probability." *Ford Motor Co. v. McDavid*, 259 F.2d 261, 266 (4th Cir.),

15

*cert. denied*, 358 U.S. 908 (1958). It is "the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." *Id.* Accordingly, when the evidence, taken in the light most favorable to the nonmovant, reveals two equally plausible alternatives, a choice of one over the other would require a reasonable jury to speculate; in such instance, summary judgment is proper.

## III.    Analysis

The Plaintiff in this case has not opposed the present motions; accordingly, the court must simply determine whether Defendants meet their burdens of "pointing out to the district court— that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325. The court will commence its analysis by addressing the federal constitutional claims, then proceed, if proper, to evaluate the remaining state claim.

### A.    Constitutional Claims

Three of the four remaining claims allege violations of the Eighth Amendment to the U.S. Constitution. Plaintiff must assert these claims pursuant to 28 U.S.C. § 1983. "To state a claim under [section] 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988); *Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009).

#### 1.    *Proper Defendants*

This case involves both government and private Defendants; for his Section 1983 claims against them, Plaintiff must demonstrate how the private corporations, SHP and Ohio Casualty, acted "under color of state law." Here, Plaintiff fails to allege or show that Ohio Casualty acted under color of state law. *See Johnson v. Allen*, 416 F. Supp. 3d 550, 562 (E.D.N.C. 2018)

16

("Johnson has not plausibly alleged that ABC Surety Company is a state actor.").[2] Thus, Plaintiff's Eighth Amendment claims (fifth, sixth, and seventh) against Ohio Casualty are dismissed.

SHP, on the other hand, is a "corporate provider of health care services that mainly contracts with local city or county jails to provide general health care services at those jails" (Memo., DE 43 at 2) and does not dispute that its actions regarding Anderson were taken "under color of state law." *See West*, 487 U.S. at 54. In fact, the Fourth Circuit has determined that "the principles of § 1983 municipal liability articulated in *Monell* and its progeny apply equally to a private corporation" that contracts with a municipality for medical services. *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 727-28 (4th Cir. 1999). Therefore, SHP may be held liable under § 1983 for unconstitutional conduct arising from its contractual duties. *See id.*

Of course, Beaufort County is clearly an entity acting under color of state law. However, "[a] county may only be held liable for acts for which the county has final policymaking authority." *Stockton v. Wake Cty.*, 173 F. Supp. 3d 292, 303 (E.D.N.C. 2016) (quoting *Parker v. Bladen Cnty.*, 583 F. Supp. 2d 736, 739 (E.D.N.C. 2008)). State law governs whether a county has final policymaking authority on a specific topic. *Id.* (citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) and *Parker*, 583 F.Supp.2d at 739). By statute, each county that operates a jail "shall develop a plan for providing medical care for prisoners in the facility." *Id.* (citing N.C. Gen. Stat. § 153A–225(a)). The plan should be "designed to protect the health and welfare of the prisoners" and "provide for medical supervision of prisoners and emergency medical care for prisoners to the extent necessary for their health and welfare." N.C. Gen. Stat. § 153A–225(a)(1) & (2). The county develops the medical care plan in consultation with local authorities, including

---

[2] In addition, Plaintiff fails to demonstrate or show that Ohio Casualty was personally involved in the alleged constitutional violations. *See id.*

17

the sheriff, the county physician, the local district health director, and the local medical society. *See id.* Thus, it is possible that Beaufort County may be held liable for certain claims under Section 1983.

Finally, Plaintiff sues Sheriff Coleman solely "in his official capacity." Typically, a government official sued "in his official capacity" is "essentially a claim against the [governmental entity] and thus should be dismissed as duplicative." *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985)); *see also Harrison v. Chalmers*, 551 F. Supp. 2d 432, 437 (M.D.N.C. 2008) (". . . a suit against a governmental officer in his official capacity is the same, for purposes of recovery, as a suit against the governmental entity itself . . . ."). However, "[u]nder North Carolina law, sheriffs have substantial independence from county government." *Parker*, 583 F. Supp. 2d at 739. County governments do not hire sheriffs (*see id.*); rather, under the North Carolina Constitution, voters directly elect sheriffs (N.C. Const. art. VII, § 2). Furthermore, "the sheriff, not the county encompassing his jurisdiction, has final policymaking authority over hiring, supervising, and discharging personnel in the sheriff's office." *Parker*, 583 F. Supp. 2d at 739; *see also* N.C. Gen. Stat. § 153A–103(1) ("Each sheriff . . . elected by the people has the exclusive right to hire, discharge, and supervise the employees in his office."). Sheriffs in North Carolina also have the "statutory responsibility for the care and custody of the inmates at the county jail." *Stockton*, 173 F. Supp. 3d at 303 (citing N.C. Gen. Stat. § 162–22. Accordingly, it is possible that Sheriff Coleman, sued in his official capacity, may be held liable under Section 1983.

> 2.    *Eighth Amendment Claims*

Plaintiff asserts three claims for deliberate indifference in violation of the Eighth Amendment: Claim Five alleges deliberate indifference to Anderson's safety by the policies,

18

practices, and customs of Beaufort County and Sheriff Coleman; Claim Six alleges deliberate indifference to Anderson's health by the policies, practices, and customs of Beaufort County, Sheriff Coleman, and SHP; and Claim Seven[3] alleges deliberate indifference to Anderson's health by the conduct of officials serving under Sheriff Coleman.

a.    Claim Seven

First, the court finds summary judgment is proper as to Claim Seven alleged against Sheriff Coleman.  Plaintiff alleges that "the inadequate and deliberately indifferent response of officers, nurses, supervisors, agents, and/or employees in the Detention Center resulted in the deprivation of the constitutional rights of the Decedent. As a direct and proximate result of said actions and/or inactions, the Decedent was denied his rights to reasonable medical treatment, to be free from serious risk of harm and to be free from any cruel or unusual punishment…."  Compl. at ¶¶ 83, 84, 87.  "[A] section 1983 plaintiff must allege the personal involvement of [an individual] defendant." *Stockton*, 173 F. Supp. 3d at 309 (citing *Iqbal*, 556 U.S. at 676 and *Monell*, 436 U.S. at 691–92).  Here, nothing in the operative pleading indicates that Sheriff Coleman, himself, was involved in the events underlying Plaintiff's claims.

In fact, Plaintiff does not allege any claims against the sheriff in his individual capacity. By naming Sheriff Coleman in his official capacity, Plaintiff essentially is suing the sheriff's "office."  Municipal entities, like the office of a sheriff (properly named as the sheriff in his/her official capacity[4]), may not be held liable under Section 1983 simply for employing a tortfeasor. *See Stockton*, 173 F. Supp. 3d at 302; *see also Connick v. Thompson*, 563 U.S. 51, 60 (2011)

---

[3] The court dismissed this claim against SHP on October 28, 2020.  Order, DE 33.

[4] *See Franks v. Beaufort Cty. Sheriff's Off.*, No. 4.19-CV-90-BO, 2019 WL 4670735, at *1 (E.D.N.C. Sept. 24, 2019) (where sheriff was named in his official capacity, "Beaufort County Sheriff's Office" was dismissed as improper party).

19

("[Municipalities] are not vicariously liable under § 1983 for their employees' actions."). "Rather, when a municipal entity is sued under section 1983—directly or through an official-capacity suit—the plaintiff must plausibly allege that a 'policy or custom' attributable to the municipal entity caused the violation of the plaintiff's federally protected rights." *Adams v. New Hanover Cty. Det. Ctr.*, No. 5:16-CT-3020-D, 2017 WL 7513347, at *3 (E.D.N.C. June 30, 2017), *aff'd sub nom. Adams v. New Hanover Cty. Det. Facility*, 703 F. App'x 202 (4th Cir. 2017) (citations omitted). Claim Seven alleges no policy, practice, or custom that caused Anderson's alleged injuries and, thus, the claim is improperly raised against Sheriff Coleman in his official capacity. The court finds summary judgment is proper as to Claim Seven.

b.    Claims Five and Six—Proper Defendants

Claim Five alleges deliberate indifference to Anderson's "safety" and "safekeeping" by the policies, practices, or customs implemented at the Detention Center. The court will dismiss this claim as alleged against Beaufort County; as set forth above, a Section 1983 action against the county is limited to its authority to implement policies concerning *medical care* for inmates at county detention centers. *See Stockton*, 173 F. Supp. 3d at 303. "[U]nder North Carolina law, any allegations concerning personnel, training, or other law enforcement policies at the county jail fall within the *sheriff's* policymaking authority and are not attributable to the county." *Adams*, 2017 WL 7513347, at *3 (citing *Parker*, 583 F. Supp. 2d at 739–40 and *Little*, 114 F. Supp. 2d at 446) (emphasis added). For the same reason, Claim Six, which alleges deliberate indifference to Anderson's "health" by the policies, practices, or customs implemented at the Detention Center, will be dismissed as against Sheriff Coleman.

20

c.    Claims Five and Six—Merits

Claim Five against Sheriff Coleman (deliberate indifference to Anderson's safety) and Claim Six against Beaufort County and SHP (deliberate indifference to Anderson's health) allege that these entities violated Anderson's Eighth Amendment rights by failing to implement policies and procedures and/or by failing to train, supervise, and monitor employees tasked with following policies and procedures concerning Anderson's safety and health. Compl. ¶¶ 61, 70. To succeed on his claims, Plaintiff must demonstrate that the Defendants' policies or customs were a "moving force behind the deprivation"; that is, "the entity's 'policy or custom must have played a part in the violation of federal law.'" *King v. Rubenstein*, 825 F.3d 206, 223 (4th Cir. 2016) (quoting *Kentucky v. Graham*, 473 U.S. 159, 166 (1985) and *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)). In addition, Plaintiff must show that each policy, practice, or custom actually violated his Eighth Amendment rights against deliberate indifference to his health and safety. *Id.* The court finds that Plaintiff fails to raise genuine issues of material fact as to the first requirement for each claim; while the court need not proceed to examine whether Plaintiff meets the second requirement, the court finds Plaintiff also fails to demonstrate material factual issues as to whether Defendants were deliberately indifferent to his health and safety in violation of the Eighth Amendment.

(1)    Policy, Custom, or Practice

It is well settled that, to hold a municipal entity liable under Section 1983, a plaintiff must prove the municipality caused a deprivation of his federal rights through an official policy or custom. *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S.

21

51, 61 (2011). "Only if a municipality subscribes to a custom, policy, or practice can it be said to have committed an independent act, the sine qua non of *Monell* liability." *Owens v. Baltimore City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014). A violation results from a municipal entity's "policy or custom" if the violation resulted from "a policy statement, ordinance, regulation, . . . [or] decision officially adopted and promulgated by that body's officers," or a governmental "custom." *Adams*, 2017 WL 7513347, at *3 (quoting *Monell*, 436 U.S. at 690–91 and citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 121 (1988)).

The Fourth Circuit admonishes courts to "bear in mind . . . that no municipality can 'be held liable under § 1983 on a respondeat superior theory.'" *Carter*, 164 F.3d at 218. "A plaintiff's theory is most likely to slip into that forbidden realm when she alleges municipal omission—either a policy of deliberate indifference or the condonation of an unconstitutional custom." *Id.* (citing *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 405 (1997)). The plaintiff "must demonstrate that a municipal decision reflects deliberate indifference to the risk that a violation of a *particular* constitutional or statutory right will follow the decision." *Id.* (citations omitted). Thus, "municipal liability will attach only for those policies or customs having a '*specific* deficiency or deficiencies . . . such as to make the *specific* violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run.'" *Id.* (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987)).

Here, the Plaintiff fails to identify a particular existing policy, custom, or practice that caused Anderson's alleged constitutional injuries.[5] Rather, he alleges that Defendants "failed to implement reasonable policies and procedures" for monitoring and evaluating the inmates' safety

---

[5] The County attaches to its motion and asks the court to consider a copy of a "Medical Plan," dated October 5, 2017, which is approximately five months *after* the incidents underlying the Plaintiff's claims. The court finds this document irrelevant to its analysis of the current motion.

22

and health or, alternatively, "fail[ed] to follow them if such policies and procedures exist." Compl. at ¶¶ 61, 70. Although a failure to implement proper policies or procedures may constitute an official policy under *Monell*, a plaintiff must identify specific deficiencies in such failure. *Carter*, 164 F.3d at 218. Other than his conclusory allegations regarding a lack of "proper and reasonable" policies or procedures and the allegations concerning conduct by SHP's, the Sheriff's, and the County's "agents and employees" with respect to Anderson's injuries,[6] Plaintiff fails to describe or produce evidence raising a material factual issue regarding a specific deficiency in Defendants' purported failures to implement policies or procedures that would "sooner or later" lead to Anderson's injuries. *See Brown*, 520 U.S. at 404 (a section 1983 plaintiff "must show that the municipal action was taken with the requisite degree of culpability and *must demonstrate a direct causal link between the municipal action [or inaction] and the deprivation of federal rights*") (emphasis added).

---

[6] Regarding the employees' conduct, Plaintiff's factual allegations state in full:

> On or about April 28, 2017 through May 7th 2017, Defendants and/or their agents and employees did not conduct routine and regular checks on the Decedent for wellness, check the Decedent's blood pressure, follow up with the Decedent's complaints of excessive coughing, vomiting, nausea and order regular and prescribed medication and/or medical device supplies, timely provide to the Decedent ordered medications and/or medical device supplies, or follow all policies and procedures for same.

> Defendants were aware that the plaintiff was suffering from flu[-]like symptoms. The plaintiff had informed the defendants that he had caught the cough that was going around the jail. The Defendant Coleman's agents kept telling the Decedent he was faking and he was not getting medical care. The defendants were aware that the plaintiff had been coughing for over 48 hours that the Decedent had a fever[,] that the Decedent complained how bad he felt, that the Decedent had high blood pressure and suffered from nausea[,] and that these conditions are sufficiently serious which produced significant physical injury to the plaintiff in the form of pneumonia and sepsis.

Compl. at ¶¶ 22, 30, 31.

23

Plaintiff also alleges Defendants failed to "adequately train, supervise, instruct, or monitor" their employees "in the proper method[s] for evaluating[, assisting and treating] inmates ... with serious medical conditions." Compl. at ¶¶ 61, 70. "In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 563 U.S. at 61. However, a "municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822–823 (1985)). A plaintiff must show that the municipality's failure to train its employees in a relevant respect amounts to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *Id.* (quoting *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).

"'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick*, 563 U.S. at 61 (quoting *Bryan Cnty.*, 520 U.S. at 410). Thus, a city may be deemed deliberately indifferent if its policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, but the city chooses to retain that program. *See id.* "Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Id.* at 62. Notably, a "pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Id.* (quoting *Bryan Cnty.*, 520 U.S. at 409).

Here, Plaintiff has failed to describe or produce evidence raising a genuine issue of material fact concerning the Defendants' deliberate indifference in their purported failures to train, supervise, or monitor their employees. The record in this case reflects that jail officers and medical

staff monitored and observed Anderson during his incarceration and responded to his medical needs when they were brought to the staff's attention. Plaintiff proffers no evidence identifying a particular deficiency or omission in the Defendants' training program or procedures or in the supervision of their employees that caused or could cause Anderson's injuries. Moreover, Plaintiff neither describes nor produces evidence demonstrating a "pattern of similar constitutional violations" by Defendants' employees, as is typically necessary to demonstrate the municipalities' deliberate indifference to Anderson's health and safety. The court finds Plaintiff has failed to demonstrate material factual issues regarding whether the Defendants' policies, practices, or customs were a "moving force behind" Anderson's deteriorating health and his ultimate death.

(2)    Deliberate Indifference

Even had the court concluded that Plaintiff met *Monell's* requirements for establishing an official policy, custom, or practice, the court finds he has failed to produce evidence demonstrating that Defendants violated Anderson's Eighth Amendment rights. The Eighth Amendment prohibits the infliction of "cruel and unusual punishments." *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016) (quoting U.S. Const. amend. VIII). In particular, the Eighth Amendment "imposes a duty on prison officials to 'provide humane conditions of confinement ... [and] ensure that inmates receive adequate food, clothing, shelter, and medical care.'" *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 832 (1994)). Plaintiffs alleging they have been subjected to unconstitutional conditions of confinement must satisfy the two-pronged test fashioned by the Supreme Court in *Farmer*. *Id.*

First, the "objective" prong requires plaintiffs to demonstrate that "the deprivation alleged [was], objectively, 'sufficiently serious.'" *Scinto*, 841 F.3d at 225 (quoting *Farmer*, 511 U.S. at 834). To be "sufficiently serious," the deprivation must be "extreme," meaning that it poses "a serious or significant physical or emotional injury resulting from the challenged conditions" or "a

25

substantial risk of such serious harm resulting from . . . exposure to the challenged conditions." *Id.* (quoting *De'Lonta v. Angelone*, 330 F.3d 630, 634 (4th Cir. 2003)). If a plaintiff alleges deliberate indifference to his health, he may demonstrate the officials' deliberate indifference to a "serious" medical need that has either "been diagnosed by a physician as mandating treatment or . . . is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* (quoting *Iko v. Shreve*, 535 F.3d 225, 241 (4th Cir. 2008)).

Second, under *Farmer's* "subjective" prong, plaintiffs must show that prison officials acted with a "sufficiently culpable state of mind," which, in conditions of confinement cases, is deliberate indifference. *Scinto*, 841 F.3d at 225. To prove deliberate indifference in violation of the Eighth Amendment, plaintiffs must show that "the official knew of and disregarded an excessive risk to inmate health or safety." *Id.* (citation and internal brackets omitted). In medical needs cases, this prong requires proof of the official's "actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." *Id.* at 226 (citation and internal brackets omitted). "A plaintiff can meet the subjective knowledge requirement through direct evidence of a prison official's actual knowledge or circumstantial evidence tending to establish such knowledge, including evidence 'that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Id.* (quoting *Makdessi v. Fields*, 789 F.3d 126, 133 (4th Cir. 2015)).

Here, even if the Plaintiff could produce evidence demonstrating his condition was "sufficiently serious" for the objective prong, he wholly fails to demonstrate any material factual issue as to whether Defendants knew of and disregarded an excessive risk to his health and safety. The unrebutted facts in this case establish that, during his incarceration, Anderson moved freely between his sleeping quarters and the open day room; at his intake, Anderson reported no medical

26

issues except anxiety and hypertension and, for five days thereafter, Anderson's blood pressure was checked daily; detention officers recorded that they observed Anderson twice per hour, except during an hour on May 6, 2017; once Anderson was placed on a detoxification program, nurses checked his blood pressure and vital signs daily and recorded his "withdrawal" symptoms; Anderson reported no illness and had no fever during these daily checks until May 7, 2017; once Anderson reported feeling ill, a nurse examined him and immediately arranged for his transport to a hospital emergency department; Anderson did not alert officers that he had been vomiting during the night preceding May 7, 2017; and Anderson told the officer who accompanied him in the ambulance that, although he felt ill, he did not report his illness to anyone at the facility until that morning. These facts establish that Anderson was observed by detention officers hourly and monitored by medical staff daily, and they reflect nothing that would support these officials' knowledge and disregard of an excessive risk to Anderson's health and safety. *See Bradshaw v. Harden*, 401 F. App'x 805, 807 (4th Cir. 2010) ("We are disinclined to hold that defendants were deliberately indifferent to a risk of which they were unaware."). The unsupported allegations in the complaint notwithstanding, and with no forecast of admissible evidence, Plaintiff has produced no evidence raising a genuine issue of material fact as to whether Defendants failed to respond to Anderson's serious medical need. Any mere disagreement Plaintiff may have concerning Anderson's medical care at the Jail is insufficient. *See Scinto*, 841 F.3d at 226. Accordingly, summary judgment is proper as to Claims Five and Six.

27

B.    Statutory Claim

Plaintiff alleges Sheriff Coleman and Ohio Casualty violated North Carolina law[7] by failing to "create and enforce adequate and appropriate policies and/or procedures to ensure the health and safety of inmates and detainees having serious medical conditions." Compl. at ¶ 47. Plaintiff seeks treble damages under N.C. Gen. Stat. § 162.55 for these violations. *Id.*

Section 162-55 of the North Carolina General Statutes provides that "[i]f the keeper of a jail shall do, or cause to be done, any wrong or injury to the prisoners committed to his custody, contrary to law, he shall not only pay treble damages to the person injured, but shall be guilty of a Class 1 misdemeanor." The statute codifies "long-standing North Carolina precedent that a sheriff and his deputies are liable for their negligence which results in an injury to a prisoner." *Stockton v. Wake Cty.*, 173 F. Supp. 3d 292, 319 (E.D.N.C. 2016) (quoting *Ramsey v. Schauble*, 141 F. Supp. 2d 584, 591 (W.D.N.C. 2001)). "To establish a claim for treble damages under N.C. Gen. Stat. § 162–55, a plaintiff must 'prove beyond a reasonable doubt that the jailer intended to injure the plaintiff or that the jailer was guilty of criminal negligence.'" *Id.* "Criminal negligence" is defined as "such recklessness or carelessness, resulting in injury or death, as imports a thoughtless disregard of consequences, or a heedless indifference to the safety and rights of others." *Id.* (quoting *Layman v. Alexander*, 294 F. Supp. 2d 784, 796 (W.D.N.C. 2003)). Further, "a sheriff or supervisor may be held liable for the acts of his subordinates under the principles of respondeat superior." *Id.*

---

[7]The court recognizes that it may decline to exercise its supplemental jurisdiction "if the district court has dismissed all claims over which it had original jurisdiction." 28 U.S.C. § 1367(c)(3). Here, however, the state law claim was based on the same facts as the federal claims, and the court finds it proper to proceed as requested by Plaintiff to exercise its pendent jurisdiction.

28

Under the doctrine of governmental immunity, a county and its public officials are immune from suits alleging negligence or intentional torts in the exercise of a governmental function, unless the plaintiff shows that the county or its public officials waived immunity. *Butterfield v. Gray*, 2021-NCCOA-523, ¶ 15, 866 S.E.2d 296, 301 (2021) (citations omitted). "Sheriffs, sheriff's deputies, and jailers have all been recognized as public officials who may avail themselves of the defense of governmental immunity." *Id.* at ¶ 15. In North Carolina, the "courts have also long deemed the operation of a county jail to be a governmental function." *Id.* Thus, Sheriff Coleman is entitled to governmental immunity unless waived.

Sheriff Coleman concedes that his immunity was waived by the purchase (and up to the amount) of a $25,000 "sheriff's bond." *See id.* at ¶ 31; *see also Myers v. Bryant*, 188 N.C. App. 585, 588, 655 S.E.2d 882, 885 (2008) ("a plaintiff may sue a sheriff and the surety on his official bond"); DE 39-1. However, he contends that Plaintiff has proffered no evidence raising a genuine issue of material fact as to whether Sheriff Coleman intended to injure Anderson or whether the sheriff was guilty of criminal negligence. The court agrees; as set forth above, the record before this court establishes that jail officers and medical staff at the Detention Center monitored Anderson during his incarceration, recorded their observations of him, and properly responded to his illness when it was brought to their attention. Under these circumstances, Plaintiff has failed to raise material factual issues as to whether Sheriff Coleman or his subordinates violated N.C. Gen. Stat. § 162-55 and summary judgment is proper.

## IV. Conclusion

The court finds Plaintiff has failed to demonstrate the existence of a genuine issue of material fact as to whether Sheriff Coleman violated Anderson's state statutory rights as alleged in Claim Three and whether Defendants violated Anderson's Eighth Amendment rights as alleged

in Claims Five, Six, and Seven. *See Butler*, 793 F.3d at 408 ("To overcome a motion for summary judgment, however, the nonmoving party may not rely merely on allegations or denials in its own pleading but must set out specific facts showing a genuine issue for trial."). Therefore, the Motion for Summary Judgment filed by Defendants Beaufort County, Sheriff Ernie Coleman, and Ohio Casualty Insurance Company [DE 38] and the Motion for Summary Judgment filed by Defendant Southern Health Partners, Inc. ("SHP") [DE 42] are GRANTED. The Clerk of the Court shall enter judgment in favor of the Defendants and close this case.

SO ORDERED this ___31ˢᵗ___ day of January, 2022.


RICHARD E. MYERS II
CHIEF UNITED STATES DISTRICT JUDGE